UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO EASTERN DIVISION

**FILED**

FEB 24 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

KARUNGI NADEGE KABASEKE,

    Plaintiff,

v.

UNIVERSITY HOSPITALS CLEVELAND
MEDICAL CENTER, CASE WESTERN
RESERVE UNIVERSITY, and WINDSOR-
LAURELWOOD CENTER FOR
BEHAVIORAL MEDICINE

    Defendants.

CASE NO.: 1:26-cv-_____

**1:26 CV 00459**

COMPLAINT

JURY DEMAND

**JUDGE RUIZ**

**MAG JUDGE ARMSTRONG**

## INTRODUCTION

1. This is a civil rights action seeking damages for violations of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983. Plaintiff also brings claims for conversion of property and violations of federal privacy laws.

2. On November 10, 2023, Defendants, acting in coordination, subjected Plaintiff to unlawful seizure, forced sedation with Category C/D teratogenic medications before conducting a pregnancy test, physical assault including chokehold restraint, sexual exposure by male officers, and involuntary psychiatric detention lasting five days. During this detention, Defendants stole $5,000 in cash and Plaintiff's Apple Watch.

3. Following Plaintiff's discharge and attempts to seek legal redress, Defendants engaged in a pattern of retaliation, evidence destruction, and obstruction of justice. Despite Plaintiff filing a contemporaneous police report, surveillance footage was destroyed, medical records were altered and later deleted from electronic systems, and protected education records were improperly shared between institutions in violation of federal law.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5. This Court has personal jurisdiction over Defendants because they reside in, are located in, and/or conduct substantial business in this judicial district, and because the acts and omissions giving rise to this action occurred within this judicial district.

6. Venue is proper in the Northern District of Ohio, Eastern Division, pursuant to 28 U.S.C. § 1391(b) because all Defendants reside or maintain their principal places of business in this district, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES

7. Plaintiff Karungi Nadege Kabaseke is an individual residing in Cleveland, Cuyahoga County, Ohio. At all times relevant to this Complaint, Plaintiff was a student at Case Western Reserve University and a recipient of Medicaid benefits.

8. Defendant University Hospitals Cleveland Medical Center ("UH") is a nonprofit corporation organized under Ohio law, with its principal place of business located at 11100 Euclid Avenue, Cleveland, Ohio 44106. UH operates medical facilities throughout Northeast Ohio, including the emergency department where the events described herein occurred. UH receives federal funding, including Medicare and Medicaid reimbursements.

9. Defendant Case Western Reserve University ("CWRU") is a private university organized under Ohio law, with its principal place of business located at 10900 Euclid Avenue, Cleveland, Ohio 44106. CWRU receives federal funding, including financial aid funds administered under Title IV of the Higher Education Act. CWRU operates its own police department, whose officers are vested with law enforcement authority under Ohio law.

10. Defendant Windsor-Laurelwood Center for Behavioral Medicine ("Windsor") is a psychiatric facility operated by Applewood Centers, Inc., an Ohio nonprofit corporation, with its facility located at 35900 Euclid Avenue, Willoughby, Ohio 44094. Windsor receives federal funding, including Medicaid reimbursements for psychiatric services.

11. At all times relevant to this Complaint, Defendants and their employees, agents, and officers acted under color of state law and within the scope of their employment, agency, or official duties. UH's police officers are vested with law enforcement authority pursuant to Ohio Revised Code § 4973.17, which authorizes hospital police to exercise the same powers as municipal police officers, including the power of arrest. CWRU operates its own police department whose officers are similarly vested with law enforcement authority under Ohio law and who initiated the seizure of Plaintiff described herein. Windsor-Laurelwood detained Plaintiff pursuant to Ohio's involuntary civil commitment statute, Ohio Revised Code § 5122.10, acting under authority delegated by the state to carry out involuntary psychiatric holds — a function traditionally and exclusively reserved to the state.

## FACTUAL ALLEGATIONS

### A. Background and November 10, 2023 Incident

12. On November 10, 2023, Plaintiff was a full-time undergraduate student at CWRU, majoring in electrical engineering. Plaintiff had established privacy restrictions in CWRU's student information system, explicitly checking the box to "Restrict all FERPA data" to prevent disclosure of her education records to third parties without her written consent.

13. On that date, CWRU police officers arrived at Plaintiff's off-campus residence without advance notice. The officers coerced Plaintiff to accompany them to University Hospitals' emergency department under threat of involuntary "pink slip" commitment.

13A. While being detained in the emergency department and denied the ability to leave, Plaintiff used her Apple Watch — the only device remaining in her possession after UH staff had confiscated her phone, computer, iPad, and all forms of identification including her school ID and state ID — to call 911. A dispatcher answered but dismissed Plaintiff's distress, and no assistance was sent. Upon learning of the call, UH medical staff directed officers to confiscate the Apple Watch as well, effectively severing Plaintiff's last means of contact with the outside world. At no point during this period did UH staff inform Plaintiff she was being legally detained, explain why her belongings had been taken, show her her patient

rights despite multiple requests, or allow her to contact anyone. Stripped of all identification and communication, Plaintiff was left with no ability to verify the identity or authority of the people holding her, no means of reaching her minor siblings who were home alone on a Friday night without their caretaker, and no way to alert her mother who was abroad. The totality of these conditions — isolation, confiscation of identity documents, refusal to explain legal status, and denial of outside contact — created circumstances consistent with unlawful detention and caused Plaintiff severe psychological distress, including fear for her own safety and the safety of her dependent siblings.

14. Shortly after being brought to UH's emergency department, UH staff coerced Plaintiff into removing her clothing and changing into a hospital gown under explicit threat of sedation, leaving Plaintiff with no undergarments beneath the gown. UH police officers then placed Plaintiff in a chokehold, causing visible injuries to her neck and wrists.

15. Before any medical evaluation or pregnancy test was conducted, UH staff administered three Category C and D medications known to cause fetal harm: Haloperidol, Lorazepam, and Olanzapine. These sedatives rendered Plaintiff unable to consent to further medical procedures or communicate effectively.

15A. After administering these sedatives, while Plaintiff was heavily medicated and unable to think clearly or respond coherently, UH staff administered the Columbia Suicide Severity Rating Scale (C-SSRS) examination. This psychiatric assessment, conducted while Plaintiff was under the influence of powerful sedatives, formed the basis for the involuntary psychiatric hold ("pink slip") authorizing Plaintiff's detention at Windsor-Laurelwood.

15B. The administration of a psychiatric assessment after forced sedation violated standard protocols, which require mental status evaluation before administering mind-altering substances. The resulting "pink slip" was procedurally invalid because it was based on an assessment of a sedated, not baseline, mental state.

16. Only after administering these teratogenic medications did UH staff conduct a pregnancy test. This sequence violated the standard of care, which requires pregnancy testing before administering medications that can cause fetal abnormalities.

17. UH billed Plaintiff's Medicaid insurance approximately $8,700 for services rendered on November 10-11, 2023, including a $383 charge for a psychiatric evaluation. However, UH's own electronic medical records system (MyChart) shows no provider accessed Plaintiff's records during the time this evaluation was purportedly conducted, indicating billing for services not rendered.

18. Following the forced sedation at UH, Plaintiff was involuntarily committed to Defendant Windsor-Laurelwood Center for a five-day psychiatric hold, from November 10-15, 2023.

18A. During Plaintiff's detention at Windsor-Laurelwood, staff denied Plaintiff access to her phone for approximately 24 hours, preventing her from contacting her mother. When Plaintiff finally received permission to use her phone, she learned that her mother had returned from Africa and had been searching for her.

18B. Plaintiff's mother was listed as Plaintiff's emergency contact in both CWRU's student records and UH's MyChart system. Neither CWRU nor UH notified Plaintiff's mother of Plaintiff's whereabouts, despite having this emergency contact information readily available.

18C. Upon returning from Africa approximately two days after Plaintiff's detention began, Plaintiff's mother went to CWRU multiple times demanding to know where her daughter was. CWRU staff refused to provide this information, despite the mother being the listed emergency contact. CWRU police also refused to cooperate with the mother's inquiries.

18D. Plaintiff's mother was ultimately forced to obtain Plaintiff's location from Plaintiff's roommate, who checked Plaintiff's last known location. This was the only way the mother could discover that her daughter was being held at Windsor-Laurelwood Center.

18E. The coordinated refusal by CWRU, UH, and Windsor to notify or inform Plaintiff's emergency contact of her whereabouts demonstrates consciousness of wrongdoing and further evidences the conspiracy between Defendants to conceal their unlawful actions.

18F. During Plaintiff's detention at Windsor, staff searched Plaintiff's book bag without authorization or consent. Nurses overheard the facility manager conducting this search and stated that it violated patient rules. When Plaintiff confronted staff about property missing from her belongings inventory, staff attributed the loss to UH, stating they had received only what UH had provided. This unauthorized search and the resulting chain of custody gap further supports the pattern of mishandling of Plaintiff's property across Defendants.

## B. Theft of Property

19. At the time of her seizure and detention, Plaintiff was the sole caretaker for her minor siblings. Plaintiff's mother had traveled to Africa for medical treatment, leaving Plaintiff responsible for her siblings' care and wellbeing.

20. Plaintiff possessed $5,000 in cash—emergency funds provided by her mother to care for Plaintiff's siblings during her mother's absence—and an Apple Watch Series 8 GPS + Cellular Aluminum 45mm, which Plaintiff had purchased for $571 (including tax). Plaintiff had also paid for AppleCare+ coverage on the device at $4.31 per month. The total value of the stolen property, including prepaid AppleCare+ coverage through April 2025, was $5,648.58.

21. The threat of involuntary psychiatric commitment was particularly coercive because Plaintiff knew her siblings depended on her as their sole caretaker. Plaintiff complied with CWRU officers' demands rather than risk the consequences of forced removal from her dorm while her mother was abroad and her siblings were in her care. The coercive effect of the threat was compounded by the fact that Plaintiff had no ability to make alternative arrangements for her siblings' care on short notice.

22. During the first approximately two days of Plaintiff's involuntary detention, before Plaintiff's mother was able to locate her, Plaintiff's minor siblings were left without their primary caretaker and without access to the emergency funds meant to ensure their safety and wellbeing. Plaintiff's mother, upon returning from Africa and discovering Plaintiff's whereabouts, was ultimately forced to obtain Plaintiff's location through Plaintiff's roommate, as all three Defendants refused to provide that information despite having emergency contact information readily available.

## C. FERPA Violations and Unlawful Information Sharing

22A. Despite Plaintiff's explicit FERPA directory restrictions prohibiting disclosure of her education records, CWRU shared Plaintiff's personally identifiable academic information with UH without Plaintiff's knowledge or written consent.

23. UH's medical records from the November 10, 2023 encounter contain detailed academic information about Plaintiff, including false statements that Plaintiff had been "found guilty" of an academic integrity violation and placed on academic probation. This information could only have come from CWRU, as Plaintiff never provided such information to UH staff.

24. Similarly, Windsor's records were improperly shared with CWRU. On November 13, 2023—while Plaintiff was still involuntarily detained at Windsor—entries appeared in CWRU's MyHealth student portal system documenting Plaintiff's psychiatric hospitalization. These entries were made by CWRU staff members Naomi Drakeford, Ph.D., and Vicki Holzhauer, LISW-S.

25. Plaintiff never informed CWRU of her whereabouts during the November 10-15, 2023 detention. Plaintiff never authorized Windsor to disclose her hospitalization to CWRU. Plaintiff never submitted any medical documentation to CWRU regarding this incident.

26. The appearance of Windsor hospitalization records in CWRU's system demonstrates an unlawful "three-way information loop" in which all three Defendants improperly shared Plaintiff's protected health information and education records without authorization, forming the basis for a conspiracy to violate Plaintiff's privacy rights.

### D. Evidence Destruction and Record Manipulation

27. On November 15, 2023, immediately following her discharge from Windsor, Plaintiff and her mother attempted to file police reports at multiple law enforcement agencies, including the Cleveland Police Department, the CWRU Police Department, and the UH Police Department. Cleveland PD and CWRU PD both refused to take the report, directing Plaintiff to UH's police department instead. At UH, Detective Trommer used intimidation tactics to discourage Plaintiff from filing and subsequently converted her written report into an internal complaint against Plaintiff's explicit wishes. When Plaintiff attempted to retrieve her police report, Detective Trommer again used intimidation tactics, the Captain refused to meet with her, and neither her Apple Watch nor her $5,000 in cash was returned.

28. UH has since admitted that all surveillance footage from the November 10-11, 2023 incident was deleted after 30 days pursuant to routine retention policies, despite the pendency of Plaintiff's police report and the reasonable anticipation of litigation.

28A. UH's own internal correspondence confirms both the incident and the evidence destruction. In a letter dated April 15, 2024, UH's System Director of Patient Care Advocacy, Elaine Jones, RN, MSN, confirmed that following Plaintiff's complaint, UH initiated "a formal review" sharing Plaintiff's concerns with "UH Leadership, UH Police Department, CMC ED Leadership, and the Grievance Committee," and acknowledged that Plaintiff's Apple Watch was lost during "a tussle" and "was never returned." In a subsequent letter dated August 19, 2025, UH's Senior Compliance Officer Taylor Stitt confirmed that "surveillance footage is destroyed after 30 days." Taken together, these letters establish that UH had full institutional knowledge of the incident through a formal police-involved internal review, yet deliberately allowed destruction of the only objective audiovisual evidence of the chokehold, four-point restraint, and property loss. UH cannot simultaneously conduct a formal investigation involving its own police department and invoke routine deletion policy as a defense — the existence of the investigation triggered a duty to preserve under Ohio law, and the destruction that followed was willful. These admissions also directly contradict UH's subsequent characterization of Plaintiff's allegations as "unsupported," as UH's own personnel documented the incident, the police involvement, and the missing property in writing months before this litigation began.

29. UH subsequently deleted the entire November 10-11, 2023 encounter from Plaintiff's MyChart electronic medical records, further destroying evidence of the billing fraud and medical malpractice.

30. When Plaintiff submitted HIPAA requests in June 2025 seeking her complete medical records, communications between Defendants, access logs, and incident reports, Defendants produced only selective, edited records and withheld critical documentation including communications with other Defendants, surveillance footage, and accounting of disclosures.

31. On July 17, 2025, UH and Windsor coordinated the release of records to Plaintiff. UH's records were generated at 11:16 AM; Windsor's records were transmitted at 3:03 PM the same day. This simultaneous production, after over a year of noncompliance with discovery requests, demonstrates coordination between Defendants to control the narrative and suppress evidence.

E. Post-Incident Retaliation by CWRU

32. In June 2025, while Plaintiff was pursuing civil litigation against Defendants in state court, CWRU initiated student conduct proceedings against Plaintiff.

33. On June 25, 2025, CWRU police officers came to Plaintiff's off-campus residence without advance notice to question Plaintiff about an alleged social media post. This visit was threatening and intimidating in nature.

34. CWRU obtained Plaintiff's phone number through a grand jury subpoena issued to the social media platform Sidechat/Yik Yak on June 23, 2025. CWRU then cross-referenced this phone number—obtained from non-university sources—with Plaintiff's student records in CWRU's internal HARLD database system to identify and locate Plaintiff.

35. This use of Plaintiff's education records to identify her for disciplinary purposes, based on information obtained through criminal subpoena, violated FERPA's restrictions on use of education records for non-educational purposes.

36. CWRU scheduled a student conduct hearing for August 12, 2025. Despite Plaintiff's filing of federal FERPA complaints with the U.S. Department of Education on August 11, 2025—complaints that were CC'd directly to CWRU's General Counsel Michelle Arendt and Associate Counsel David Rosenfeldt—CWRU proceeded with the hearing on August 12, 2025.

37. The conduct proceeding was procedurally flawed. CWRU refused to produce disclosure logs as required by FERPA. Director of Student Conduct George O'Connell withheld over 15 emails of exculpatory context and collaborated directly with CWRU General Counsel, the same office defending against Plaintiff's litigation, thereby tainting the impartiality of the proceeding.

38. CWRU found Plaintiff responsible for "intimidation" based on a non-threatening, off-campus comment acknowledged by CWRU to be "just a joke." CWRU imposed probation and a mandatory civility module as punishment.

39. Plaintiff filed an appeal of the conduct finding on all available grounds: procedural violations, new evidence of misconduct by administrators, and disproportionate sanctions. That appeal remains pending.

F. State Court Proceedings and Denial of Justice

40. On May 14, 2024, Plaintiff filed a civil action in the Cuyahoga County Court of Common Pleas against all three Defendants (Case No. CV-24-997483) asserting claims of medical malpractice, civil rights violations, negligence, intentional infliction of emotional distress, and related claims.

41. Defendants moved to stay discovery. On November 21, 2024, the state court granted Defendants' motions to stay discovery, preventing Plaintiff from obtaining the evidence necessary to support her claims.

42. On May 22, 2025, the state court issued a Journal Entry dismissing UH and CWRU from the case, characterizing their motions as "unopposed" despite Plaintiff having filed opposition. The court held Windsor's motion in abeyance and granted Plaintiff until July 22, 2025, to file an affidavit of merit as required under Ohio's medical malpractice statute.

43. Plaintiff was unable to obtain an affidavit of merit because Defendants had successfully stayed discovery and refused to produce the medical records, incident reports, communications, and other documentation necessary for an expert to review and form an opinion on the standard of care.

44. On July 21, 2025, Plaintiff filed unopposed motions to reinstate UH and CWRU as defendants, citing newly discovered evidence of FERPA violations, evidence destruction, and coordination between Defendants.

45. Plaintiff filed additional motions on August 18, 2025, and September 17, 2025, all of which remained unopposed by any Defendant and none of which received any ruling from the court.

46. On July 2, 2025, Plaintiff filed an Emergency Motion for Temporary Restraining Order to prevent CWRU from proceeding with retaliatory student conduct proceedings while FERPA violations remained unresolved. Plaintiff filed three supplements to this motion on July 7, August 6, and August 11, 2025, presenting substantial evidence of ongoing violations and retaliation. The court never held a hearing or issued a ruling on this motion.

47. After holding Plaintiff's unopposed motions pending for eight months without ruling, without hearings, and without explanation, the state court on February 19, 2026, issued two Journal Entries: (1) denying Plaintiff's June 26, 2025 motion to extend time to file an affidavit of merit, and (2) granting Windsor's Motion for Judgment on the Pleadings and dismissing all of Plaintiff's claims.

48. The February 19, 2026 Journal Entry assessed court costs against Plaintiff, effectively punishing Plaintiff for seeking justice after being denied access to discovery, denied rulings on unopposed motions, and denied hearings on emergency relief.

49. The state court proceedings are recounted solely as background context. Plaintiff's federal claims arise independently from Defendants' unconstitutional conduct on and after November 10, 2023, and do not ask this Court to review or overturn any state court judgment.

49A. Plaintiff's claims are timely under Ohio's savings statute, Ohio Revised Code § 2305.19, which tolls the statute of limitations for one year following a dismissal not on the merits. The state court's February 19, 2026 dismissal was procedural, not on the merits, and Plaintiff files this action within that savings period. Additionally, equitable tolling applies because Defendants' active concealment of evidence, destruction of records, and obstruction of Plaintiff's ability to discover the full scope of their coordinated conduct prevented timely filing. Plaintiff could not reasonably file federal claims before November 10, 2025 because Defendants' destruction of surveillance footage, deletion of medical records from MyChart, and active concealment of the internal investigation — not revealed until UH's April 2024 and August 2025 correspondence — prevented Plaintiff from discovering the full scope of coordinated constitutional violations necessary to plead a federal civil rights action. The April 15, 2024 letter was the first written confirmation that UH had conducted a formal police-involved internal review, and the August 19, 2025

letter was the first written confirmation that surveillance footage had been destroyed — both of which are essential predicate facts for Plaintiff's federal constitutional claims.

## CLAIMS FOR RELIEF
### COUNT I
**42 U.S.C. § 1983 – FOURTH AMENDMENT VIOLATION**
(Unlawful Seizure)
(Against All Defendants)

50. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

51. The Fourth Amendment to the United States Constitution protects individuals from unreasonable seizures of their person.

52. On November 10, 2023, Defendants, acting under color of state law and in coordination with each other, seized Plaintiff without probable cause, without a valid warrant, and without Plaintiff posing any imminent danger to herself or others.

53. CWRU police officers coerced Plaintiff to UH under threat of involuntary commitment. UH staff physically restrained Plaintiff and administered forced sedation. Windsor detained Plaintiff for five days against her will.

54. At no time did Defendants obtain judicial authorization for Plaintiff's seizure or detention. The "pink slip" used to justify Plaintiff's commitment was executed after Plaintiff was already in custody and under the influence of forced sedation, rendering it procedurally invalid.

54A. The involuntary psychiatric hold was procedurally invalid because it was based on a Columbia Suicide Severity Rating Scale (C-SSRS) examination administered after Plaintiff had been forcibly sedated with powerful psychiatric medications. Standard protocols require mental status evaluation before administering sedatives, not after. The "pink slip" therefore lacked a valid factual basis.

54B. Defendants' coordinated refusal to notify Plaintiff's designated emergency contact, despite having this information readily available, demonstrates that Defendants knew their detention of Plaintiff was improper and sought to conceal it from Plaintiff's family.

55. Defendants' coordinated actions constituted an unreasonable seizure in violation of the Fourth Amendment.

56. As a direct and proximate result of Defendants' unlawful seizure, Plaintiff suffered physical injuries, emotional distress, loss of liberty, damage to her academic standing, and other damages.

### COUNT II
**42 U.S.C. § 1983 – FOURTH AMENDMENT VIOLATION**
(Excessive Force)
(Against University Hospitals)

57. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

58. The Fourth Amendment prohibits law enforcement and those acting in concert with law enforcement from using excessive force during a seizure.

59. UH police officers and staff used objectively unreasonable force against Plaintiff throughout the encounter. Prior to the physical restraint, UH staff had coerced Plaintiff into removing her clothing and changing into a hospital gown under explicit threat of sedation, leaving Plaintiff with no undergarments beneath the gown. When UH police officers subsequently physically dragged Plaintiff from the hallway into the nearby room, a male UH officer placed Plaintiff in a chokehold, knocking the air from her lungs and slamming her against the wall. Plaintiff repeatedly stated "you are choking me" until the officer released her. Officers and staff then picked Plaintiff up by her arms, legs, and feet, forced her onto the bed, and applied four-point restraints, cuffing both wrists and both ankles to the bed frame. No written physician order was obtained for four-point restraint as required by clinical protocol. During this process, Plaintiff was surrounded by multiple male officers and her body was exposed beneath the gown. Plaintiff yelled that she was being sexually assaulted. A female UH officer verbally responded that the exposure did not constitute sexual assault before moving to cover Plaintiff — prioritizing characterization over immediate action to protect Plaintiff's dignity. UH staff then administered sedation by injection to Plaintiff's thighs while she remained four-point restrained. Plaintiff explicitly and verbally refused, stating she did not want to be sedated. A UH nurse responded that Plaintiff had "lost that right" — an explicit acknowledgment that Plaintiff held the right to refuse, and a conscious decision to override it. Plaintiff responded that it was "funny how you all now know what rights are when you are assaulting me," referencing UH staff's repeated prior refusals to provide Plaintiff with her patient rights documents despite multiple requests. After the situation subsided, the attending physician returned and stated he was sorry for what had happened, acknowledging the impropriety of Plaintiff's treatment.

60. The force used against Plaintiff was objectively unreasonable under the circumstances. Plaintiff was not violent, was not resisting arrest, and posed no threat to officers or staff.

61. As a direct and proximate result of UH's use of excessive force, Plaintiff suffered physical injuries including visible scars on her wrists, psychological trauma, and ongoing emotional distress.

COUNT III
42 U.S.C. § 1983 – FOURTEENTH AMENDMENT VIOLATION
(Substantive Due Process)
(Against All Defendants)

62. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

63. The Fourteenth Amendment protects individuals' liberty interest in their bodily integrity and freedom from involuntary medical treatment.

64. Defendants forcibly administered Category C and D teratogenic medications to Plaintiff before conducting a pregnancy test, in violation of the standard of care and Plaintiff's right to refuse medical treatment.

65. Defendants' conduct was conscience-shocking and violated contemporary standards of decency. Administering medications known to cause fetal harm without first determining pregnancy status demonstrates deliberate indifference to Plaintiff's fundamental rights and safety.

66. Defendants further violated Plaintiff's due process rights by administering a psychiatric evaluation while Plaintiff was under the influence of sedatives, then using this invalid assessment to justify continued detention. This violated Plaintiff's liberty interest in freedom from involuntary commitment based on unreliable medical evaluations.

67. As a direct and proximate result of Defendants' violations of substantive due process, Plaintiff suffered physical harm, emotional distress, invasion of bodily autonomy, and fear of potential reproductive harm.

COUNT IV
42 U.S.C. § 1983 – FOURTEENTH AMENDMENT VIOLATION
(Procedural Due Process)
(Against Case Western Reserve University)

68. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

69. CWRU's disciplinary actions constitute state action because CWRU operates its own police department vested with law enforcement authority under Ohio law, and because CWRU acted in concert with UH — a state-authorized entity — in the coordinated detention and surveillance of Plaintiff.

70. Plaintiff had a protected property and liberty interest in her continued enrollment at CWRU and her freedom from false disciplinary findings that would impact her academic and professional future.

71. CWRU denied Plaintiff due process by: (a) using FERPA-protected records obtained through improper means to identify and prosecute Plaintiff; (b) withholding exculpatory evidence; (c) coordinating the disciplinary process with General Counsel engaged in litigation against Plaintiff; (d) proceeding with the hearing despite pending federal FERPA complaints; and (e) imposing sanctions for speech that CWRU itself acknowledged was "just a joke."

72. CWRU's conduct deprived Plaintiff of a fundamentally fair disciplinary process, violating her Fourteenth Amendment right to procedural due process.

73. As a direct and proximate result, Plaintiff suffered reputational harm, emotional distress, and the burden of probationary status and mandatory training.

COUNT V
CONVERSION
(Against All Defendants)

74. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

75. At the time of her seizure and detention, Plaintiff possessed $5,000 in cash (emergency funds for sibling care) and an Apple Watch Series 8 GPS + Cellular valued at $571, plus prepaid AppleCare+ coverage through April 2025 valued at $77.58, for a total property value of $5,648.58.

76. Defendants, or their agents or employees, exercised unauthorized control over Plaintiff's property by taking possession of these items during the restraint and detention process.

77. Defendants have refused to return Plaintiff's property despite multiple demands.

78. Defendants' unauthorized exercise of control over Plaintiff's property, with the intent to deprive Plaintiff of its use and enjoyment, constitutes conversion under Ohio law.

79. As a direct and proximate result of Defendants' conversion, Plaintiff has suffered economic damages in the amount of $5,648.58, plus interest, as well as additional harm from being unable to fulfill her

responsibilities as sole caretaker for her minor siblings during her mother's absence and from continued payments for AppleCare+ coverage on a device Defendants wrongfully retained.

## COUNT VI
## CONSPIRACY TO VIOLATE CIVIL RIGHTS
## 42 U.S.C. § 1983
## (Against All Defendants)

80. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

81. Defendants entered into an agreement, and engaged in a concerted action, to deprive Plaintiff of her constitutional rights.

82. The evidence of conspiracy includes: (a) the improper sharing of Plaintiff's protected education records and medical records between all three Defendants without authorization; (b) the coordinated timing of record production on July 17, 2025; (c) the systematic destruction and concealment of evidence by all Defendants; (d) the "three-way information loop" in which CWRU shared education records with UH, UH transferred Plaintiff to Windsor, and Windsor's records appeared in CWRU's system without Plaintiff's authorization; (e) the pattern of obstruction and retaliation following Plaintiff's attempts to seek legal redress; and (f) UH staff's directive to confiscate Plaintiff's Apple Watch immediately after Plaintiff used it to call 911, severing her last means of outside contact, and the coordinated refusal of three separate law enforcement agencies — Cleveland PD, CWRU PD, and UH PD — to accept Plaintiff's police report, effectively ensuring no external investigation could proceed.

82A. Further evidence of conspiracy includes the coordinated refusal by all three Defendants to notify or provide information to Plaintiff's designated emergency contact. Despite having emergency contact information readily available, CWRU refused to tell Plaintiff's mother where her daughter was being held, UH failed to trigger emergency contact notifications as required, and Windsor delayed Plaintiff's phone access for 24 hours, preventing her from contacting her mother. This coordinated concealment demonstrates a meeting of the minds to hide Plaintiff's detention from her family.

83. Defendants acted with a meeting of the minds to violate Plaintiff's rights, as demonstrated by their coordinated conduct and the unlawful exchange of protected information. The meeting of the minds is demonstrated not merely by parallel conduct but by the affirmative exchange of Plaintiff's protected records between institutions, the coordinated simultaneous production of records on July 17, 2025, and UH's own internal correspondence confirming joint review between UH Leadership, UH Police, and ED Leadership.

84. As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered violations of her constitutional rights, emotional distress, reputational harm, economic damages, and other injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Karungi Nadege Kabaseke respectfully requests that this Court:
A. Enter judgment in favor of Plaintiff and against Defendants on all counts;

B. Award Plaintiff compensatory damages in an amount to be determined at trial, including but not limited to:
   1. Economic damages for the theft of $5,000 in cash and Apple Watch;
   2. Damages for physical injuries, pain and suffering;
   3. Damages for emotional distress, mental anguish, and psychological trauma;

4. Damages for violation of constitutional rights;

5. Damages for reputational harm and interference with academic standing;

6. Damages for interference with family relationships and caretaking responsibilities;

7. Damages for the emotional distress of being unable to care for dependent siblings during detention;

8. Damages for denial of family contact and interference with emergency contact notifications;

9. Damages for emotional distress suffered by being prevented from contacting her mother while detained;

C. Award Plaintiff punitive damages against each Defendant in an amount sufficient to punish their willful, wanton, and malicious conduct and to deter similar conduct in the future;

D. Issue declaratory relief finding that Defendants violated Plaintiff's Fourth Amendment right to be free from unreasonable seizure, Fourteenth Amendment rights to due process and bodily integrity, and federal privacy laws including FERPA;

E. Issue injunctive relief:

1. Ordering CWRU to vacate Plaintiff's disciplinary finding and remove all related records;

2. Ordering CWRU to expunge all improperly obtained records from Plaintiff's student file;

3. Ordering all Defendants to produce complete and unredacted records, communications, access logs, and disclosure accountings;

4. Enjoining Defendants from further retaliation against Plaintiff;

F. Award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law;

G. Award pre-judgment and post-judgment interest at the maximum rate permitted by law;

H. Grant Plaintiff a trial by jury on all issues so triable; and

I. Grant such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: February 24, 2026

_____

Karungi Nadege Kabaseke
2072 West 95th Street, Apt #1
Cleveland, OH 44102
Tel: (216) 396-5994
Email: nadiakabaseke@gmail.com
Pro Se Plaintiff